## JOHNSON *v.* JESSOP.

1. Master and Servant—Breach of Contract—Damages—Burden of Proof—Excuse.

Employee made a prima facie case for damages for breach of contract by unlawful discharge, where he gave evidence proving the contract, performance up to the time of discharge and damages, and thereby cast the burden upon defendant employer to show a legal excuse for the discharge.

2. Same—Discharge—Excuse—Affirmative Defense.

The defense of legal excuse for the discharge of one employed under a contract of employment is an affirmative defense.

3. Same—Discharge—Excuse—Preponderance of Evidence.

Defendant employer who had discharged plaintiff as manager of a restaurant with drive-in service as an added feature, failed to show legal excuse for such discharge by a preponderance of the evidence by proof that plaintiff had failed to perform work

References for Points in Headnotes
[1–3] 35 Am Jur, Master and Servant §§ 36 *et seq.,* 59.
[1–3] Negligence or incompetency as ground for discharge of employee. 49 ALR 472.

usually done by waitresses, that plaintiff borrowed $200 from a friend who also supplied certain merchandise used in restaurants, that plaintiff made improper advances which were successfully resisted by married waitresses who did not quit work, or that business was not a financial success under plaintiff's management, where other evidence was presented showing business was operated at a loss before as well as after defendant's period of service.

Appeal from Ingham; Salmon (Marvin J.), J. Submitted January 15, 1952. (Docket No. 58, Calendar No. 45,329.) Decided March 6, 1952.

Assumpsit by Frank J. Johnson against James K. Jessop for damages for breach of employment contract. Judgment for plaintiff. Defendant appeals. Affirmed.

*William H. Wise,* for plaintiff.

*Benjamin F. Watson,* for defendant.

BOYLES, J. This is an appeal from a judgment entered for the plaintiff by Judge Salmon in Ingham county in a law case heard by the court without a jury. On December 12, 1949, plaintiff and defendant entered into a written agreement whereby the defendant employed said plaintiff for 1 year as manager of a drive-in restaurant owned in Lansing by the defendant. Plaintiff's salary was to be $5,120, to be paid in weekly instalments. On April 13, 1950, the defendant discharged plaintiff and plaintiff brought this suit claiming breach of his contract for employment. In his declaration the plaintiff avers that on April 13, 1950, the defendant informed him that he wished to sell or lease the restaurant and that plaintiff's services were no longer needed. The defendant's answer admits the contract but denies its breach by him. He claims that the plaintiff had

failed to exercise reasonable diligence in managing the business, had permitted costs of operation to exceed the bounds of good management, failed to attend to his duties, operated said business "in the red," failed to keep expenses within income, was "too familiar" with employees, and had failed to be active and participating in the actual operation of the business. In short, the defendant claimed that plaintiff was discharged because, "plaintiff's complete failure to understand, accept and discharge his duties with that reasonable skill, diligence and application reasonably to be expected under the existing circumstances, constituted a full and complete breach of the contract of hire between the parties and by the existence thereof did give this defendant adequate cause to terminate the contractual relations."

To the contrary, plaintiff testified that he was discharged for the following reason, given to him at that time:

"Well, he said the place wasn't making any money and he couldn't afford to pay the money he was paying me at that time, and he had it up for a lease or sale and he says until that time he would run it himself."

The law governing the case is plainly stated as follows:

"The plaintiff gave evidence tending to show that he had performed the contract up to the time of his discharge. The burden of proof was, of course, upon him to prove his contract and its performance up to that time. This made out his case. The burden then shifted to the defendant to show a legal excuse for his discharge. The defense was an affirmative one, like that of payment or satisfaction of a debt." *Milligan* v. *Sligh Furniture Co.,* 111 Mich 629, 633.

See, also, *Saari* v. *George C. Dates & Associates, Inc.,* 311 Mich 624, 628.

The plaintiff established his case by proving the contract, his performance up to the time of his discharge, and his discharge. The defendant's proofs to establish his claim of a breach of the contract by the plaintiff were:

A woman customer testified that she had frequently had dinner at the restaurant with her husband, that the plaintiff had never escorted them to a table or given them a menu or a glass of water, that the tables were dirty, and that she had never seen the plaintiff take cash or clear a table.

As to that, there is nothing in the contract that required the plaintiff as manager to perform the above acts usually performed by waitresses. His duties as defined by the contract were managerial. The only addition to his employing help, keeping inventory and accounts, depositing money and paying bills, and like managerial services, was that, "the manager shall devote 6 days of each week to the operation of this business, totalling 54 hours weekly, which work days shall be optional except that the manager shall always work on Friday, Saturday and Sunday. The manager shall also be present on the premises during the lunch and dinner hours of each working day, on Friday and Saturday evenings, and on Sunday afternoons and evenings."

There is no substantial proof that plaintiff violated the contract as to the hours or time he performed his duties.

The defendant showed—and plaintiff admitted—that plaintiff had obtained a personal loan of $200 from a friend who was also a supplier of certain merchandise (ice cream and fountain supplies) used in the restaurant, which loan had not yet been repaid. There was no proof that this loan had any effect on plaintiff's management of the business, or that it influenced the purchase of or payment for supplies from the lender. The defendant himself testified

that he made no claim that plaintiff's borrowing from the supplier worked to his (defendant's) disadvantage. He merely could "see the possibility."

The owner or proprietor of 5 local food establishments (one of them seating 900 persons), testified at length, from his experience, that restaurants generally limited food costs to 50% of income, and labor costs to 30%, leaving a small balance out of the remaining 20% after paying "overhead"—rent, utilities, laundry, insurance, payroll tax—which should leave a profit of around 3%. Plaintiff's food and labor costs exceeded these proportions. It was also shown that the restaurant had been operated at a loss by the defendant himself or other managers for about a year-and-a-half prior to his hiring of the plaintiff, and that it continued to operate "in the red" during the succeeding 4 months under plaintiff's management, and thereafter. It was a small restaurant employing 3 waitresses. Plaintiff testified that he was unsuccessful in trying to find part-time help. The monthly gross income for October, 1949, and for April, May and June, 1950, both before and after plaintiff had charge, was approximately twice the monthly income for December to March, inclusive, during plaintiff's management. This leads to a fair inference that the difference was due to sales at the drive-in, contrasted with the income from the dining-room service during the winter months. The restaurant was a "drive-in" sandwich and fountain service, with an added dining room. Plaintiff managed the place in the winter, from December 13th to April 13th. The defendant admitted that because of weather conditions "there are months in the year when the drive-in is not open."

Two waitresses working in the restaurant testified for the defendant that on occasions when the plaintiff was taking each of them home at night after their work he made improper advances and pro-

posals, which they successfully resisted. Both of them were married women with families, living with their husbands, and neither of them quit work at the restaurant because of these occurrences. One of them was still working there at the time of the trial, and no outside publicity was given. While their conduct on these occurrences must be commended, and plaintiff's actions were reprehensible, the trial court correctly reached the conclusion that plaintiff's conduct in that regard did not have any effect upon the business or amount to a breach of the contract.

Other testimony offered by the defendant was limited to proofs as to the actual work that plaintiff did or did not do in the restaurant, and as to his bookkeeping and accounting methods concerning which no express question has been raised.

On the question of excessive costs for food and help, the defendant concedes that the business operated continuously at a loss from the time he acquired it in June, 1948, and his counsel frankly concedes:

"If our only complaint of plaintiff and his managerial action was as to excessive costs, the writer feels candidly that the question was close enough on the facts to sustain the trial court's finding.   *   *   * The trial court found against the defendant on this issue and we are not persuaded that, under the circumstances, we could successfully, in law, challenge that finding alone."

As an equally frank indication of the real reason why he terminated plaintiff's employment, the defendant testified:

"*Q*. Were there any discussions between you and Johnson in the early part of 1950, January, February and March, as to the job he was doing there?

"*A*. Well, in February and March I discussed with Mr. Johnson several times, I told him, as I told him when I hired him, that I couldn't lose any more mon-

ey, that I was borrowing money at the time, and that I felt that I shouldn't do it to keep the place open."

The trial court hearing the case without a jury concluded:

"The court is of the opinion that he (plaintiff) could have done better, but cannot say after considering all of the evidence that the defendant established by a fair preponderance of the evidence that the plaintiff's conduct amounted to a breach of the contract. The facts and circumstances disclosed appear to be open to an inference that the defendant had an unprofitable business on his hands and knew that the plaintiff had not and in his opinion would not make it profitable and that the risk of damages under the contract was the better alternative."

The testimony does not clearly preponderate in the opposite direction.

Affirmed.

NORTH, C. J., and DETHMERS, BUTZEL, CARR, BUSHNELL, SHARPE, and REID, JJ., concurred.